## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

FLIP PHONES GAMES INC.,

    Plaintiff,

    v.

PLR Worldwide Sales Limited,

    Defendant.

Case No. 2:23-cv-139

**JURY TRIAL DEMANDED**

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Flip Phone Games Inc. ("Plaintiff" or "FPG") brings this complaint for patent infringement against Defendant PLR Worldwide Sales Limited ("Playrix" or "Defendant") and alleges as follows:

## NATURE OF ACTION

1.    This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271.

## THE PARTIES

2.    FPG is a corporation organized under the laws of the State of Delaware, with its principal place of business at 841 23rd Street, Santa Monica, CA 90403 USA.

3.    Upon information and belief, Playrix is a corporation organized under the laws of Ireland, with its principal place of business at 4th floor, Red Oak North, South County Business Park, Leopardstown, Dublin 18 D18 X5K7, Ireland.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this case arises under the patent laws of the United States, Title 35 of the United States Code.

5.      This Court has personal jurisdiction over Playrix because Playrix has, directly or through agents and/or intermediaries, committed acts within the State of Texas, including within this District, giving rise to this action and/or has established minimum contacts with the State of Texas and this District such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. For example, Playrix conducts substantial business in the State of Texas and in this District, including (1) committing at least a portion of the infringing acts alleged herein and (2) regularly transacting business, soliciting business, and deriving revenue from the sale of goods and services, including infringing goods and services, to individuals in the State of Texas, including within this District. Thus, Playrix has purposefully availed itself of the benefits of the State of Texas, and the exercise of jurisdiction over Playrix would not offend traditional notions of fair play and substantial justice.

6.      Alternatively, and/or in addition, this Court has jurisdiction over Playrix under Federal Rule of Civil Procedure 4(k)(2). This action arises from actions of Playrix directed toward the United States, including (1) committing at least a portion of the infringing acts alleged herein and (2) regularly transacting business, soliciting business, and deriving revenue from the sale of goods and services, including infringing goods and services, to individuals in the United States. Therefore, Playrix has purposefully availed itself of the benefits of the United States, including this District, and the exercise of jurisdiction over Playrix would not offend traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c), as Playrix is not a resident of the United States.

## BACKGROUND

8.      FPG originated from mobile game developer Mobile Deluxe ("MDX"), which was founded in 2003 by Joshua Hartwell and Paul Bolten as GOSUB 60 Inc. ("GOSUB"). MDX was a small developer, with only two employees at its inception, focused on developing and publishing mobile games.

9.      At the time MDX was founded—years before the launch of smartphones or modern online stores for smartphone app purchases ("App Stores")—the mobile game landscape was very different than it is today and stayed that way until after smartphones became widespread. App Stores did not become available until at least 2008, and prior to that time, wireless carriers each managed their own individual app store or "deck," with a limited catalog of games (typically two hundred to five hundred titles at once). Once that capacity was reached, the carrier would be forced to remove or "sunset" older game titles to make room for new games, resulting in a short life cycle for mobile games.

10.     Games in the pre-App Store world were sold as a one-time purchase, typically $4.99 to $9.99 each. Because of the lifecycle and business model at the time, it did not make sense for carriers, developers, or publishers to update a game during its lifetime, and there was no expectation a game would evolve. Instead, developers would, for example, launch a sequel to a game, which would be treated by carriers as a new title, triggering a new lifecycle for that new title.

11.     Rather than following the typical business model for games at the time, however, MDX focused on innovation. MDX invented systems and methods to dramatically change the

game a consumer had already downloaded (and paid for), which MDX understood was a method to keep players engaged and keep games fresh. This technology allowed carriers to work with MDX to update content and promotions presented to customers through gaming updates tailored based on factors including a type of the mobile communication device, a telecom service associated with the mobile communication device, and a service provider of the telecom service. MDX was also the first to develop downloadable content and hot spots for mobile games based on certain parameters.

12.    MDX's pioneering approach to mobile gaming technology eventually led to success in an extremely competitive market. MDX successfully introduced many mobile games into the market, including games that pre-dated smartphones and App Stores by years.

13.    MDX also focused heavily on its intellectual property portfolio, filing multiple patent applications, and obtaining patents that are foundational to features still used across the mobile gaming industry today.

14.    In 2021, following a corporate reorganization, FPG sold MDX to Murka Games Limited, but FPG retained ownership of MDX's patent portfolio.

## THE PATENTS-IN-SUIT

15.    United States Patent No. 9,731,202 ("the '202 Patent") is titled "Methods and Systems for Updating In-Game Content," and was duly and legally issued by the United States Patent and Trademark Office on August 15, 2017. The term of the '202 Patent has not expired. The '202 Patent is valid and enforceable, and FPG is the owner and assignee of all substantial rights in the '202 Patent, a copy of which is attached as **Exhibit A**. As such, FPG has standing to sue and the right to recover damages for the infringement of the '202 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

16.     United States Patent No. 10,617,958 ("the '958 Patent") is titled "Methods and Systems for Updating In-Game Content," and was duly and legally issued by the United States Patent and Trademark Office on April 14, 2020. The term of the '958 Patent has not expired. The '958 Patent is valid and enforceable, and FPG is the owner and assignee of all substantial rights in the '958 Patent, a copy of which is attached as **Exhibit B**. As such, FPG has standing to sue and the right to recover damages for the infringement of the '958 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

17.     United States Patent No. 11,117,056 ("the '056 Patent") is titled "Methods and Systems for Updating In-Game Content," and was duly and legally issued by the United States Patent and Trademark Office on September 14, 2021. The term of the '056 Patent has not expired. The '056 Patent is valid and enforceable, and FPG is the owner and assignee of all substantial rights in the '056 Patent, a copy of which is attached as **Exhibit C**. As such, FPG has standing to sue and the right to recover damages for the infringement of the '056 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

18.     United States Patent No. 8,688,089 ("the '089 Patent") is titled "Methods and Systems for Providing In-Game Hot Spots," and was duly and legally issued by the United States Patent and Trademark Office on April 1, 2014. The term of the '089 Patent has not expired. The '089 Patent is valid and enforceable, and FPG is the owner and assignee of all substantial rights in the '089 Patent, a copy of which is attached as **Exhibit D**. As such, FPG has standing to sue and the right to recover damages for the infringement of the '089 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

19.     United States Patent No. 9,427,662 ("the '662 Patent") is titled "Methods and Systems for Providing In-Game Hot Spots," and was duly and legally issued by the United States

Patent and Trademark Office on August 30, 2016. The term of the '662 Patent has not expired. The '662 Patent is valid and enforceable, and FPG is the owner and assignee of all substantial rights in the '662 Patent, a copy of which is attached as **Exhibit E**. As such, FPG has standing to sue and the right to recover damages for the infringement of the '662 Patent and pursue any and all causes of action and remedies, whether legal or equitable, related thereto.

20.     Each of the claims of the '202 Patent, the '958 Patent, the '056 Patent, the '089 Patent, and the '662 Patent (collectively "the Patents-in-Suit") is presumed to be valid.

21.     The claims of the Patents-in-Suit are not directed to an abstract idea, and the claim limitations, individually and as an ordered combination, involve more than performance of well-understood, routine, and conventional activities previously known to the industry as of their priority date.

22.     The claims of the Patents-in-Suit are not directed toward fundamental economic practices, methods of organizing human activities, an idea itself, or mathematical formulas.

23.     The claims of the Patents-in-Suit are directed to a narrow area of application and thus do not pre-empt others from using other methods and systems.

24.     The claims of the Patents-in-Suit also recite more than generic computer functionality and recite steps that were not purely conventional as of the priority date of the Patents-in-Suit.

25.     The claims of the Patents-in-Suit recite improvements over prior art and conventional systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the Patents-in-Suit, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood,

conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest priority date of each of the Patents-in-Suit.

26.     None of the claims of the Patents-in-Suit are representative of the Patent-in-Suit's other claims or the claims of the other Patents-in-Suit.

27.     The '202 Patent, the '958 Patent, and the '056 Patent are collectively referred to herein as "the Updating Game Content Patents." The '202 Patent was originally filed as U.S. Patent Application No. 11/768,890, on June 26, 2007, and the '958 and the '056 Patents both claim priority to that application. The Updating Game Content Patents all include substantially the same specification, which describes systems and methods for updating content of a video game played on a mobile device and addresses shortcomings in the prior art.

28.     The Updating Game Content Patents explain that "[m]any mobile communication devices (including cellular phones, PDAs, and other handheld devices capable of communicating with a server) are capable of operating video games," and, further, that "most current mobile communication devices come equipped with one or more games at the time of purchase, and most modern mobile communication devices also allow users to download and/or purchase new games." '202 Patent, 1:12–18. "As a result, gaming on mobile communication devices has become a popular mode of entertainment in a mobile environment." *Id.* at 1:24–26.

29.     However, "[a]s game elements become increasingly familiar to players, the game may hold less surprises and/or no longer present a challenge to the user, at which point the user may stop playing that particular game in favor of others." '202 Patent, 1:29–32. The Updating Game Content Patents describe solutions to this problem by "updating in-game content on a mobile communication device," which "may prolong user interest in a game for a mobile communication device …." *Id.* at 2:7–11. As the Updating Game Content Patents explain: "The ability to update

in-game content may allow game companies to keep game elements fresh and prolong user enjoyment of the game. For example, a particular scene within the game may be rearranged so that the user has something new to look at or explore. In one embodiment, the updated content may comprise a new level within the game.… Consequently, the game may sustain its popularity and be more profitable for the game creator than existing mobile communication device games." *Id.* at 4:30–45.

30.     The claims of the Updating Game Content Patents are directed to improving computer functionality and increase the utility of computer-implemented games on mobile devices by allowing content of those games to be updated from a server based on certain parameters, which was not previously possible in the art. *See, e.g.*, '202 Patent, 5:13–6:33, 7:14–12:67, 13:1–14:61, Figs. 1, 3A–3B, 4A–4B. These games cannot be played outside of the context of the claimed computer components on which they run.

31.     The claims of the Updating Game Content Patents are directed to improving computer functionality through systems or methods that drive engagement by game players and help to retain control over the attention of the game players through allowing content of those games to be updated from a server based on certain parameters. As the Updating Game Content Patents describe, "[a]s game elements become increasingly familiar to players, the game may hold less surprises and/or no longer present a challenge to the user, at which point the user may stop playing that particular game in favor of others." '202 Patent, 1:29–32. The Updating Game Content Patents describe solutions to this problem by "updating in-game content on a mobile communication device," which "may prolong user interest in a game for a mobile communication device …." *Id.* at 2:7–11. As the Updating Game Content Patents explain: "The ability to update in-game content may allow game companies to keep game elements fresh and prolong user

enjoyment of the game. For example, a particular scene within the game may be rearranged so that the user has something new to look at or explore. In one embodiment, the updated content may comprise a new level within the game.… Consequently, the game may sustain its popularity and be more profitable for the game creator than existing mobile communication device games." *Id.* at 4:30–45.

32.    The subject matter of the claims of the Updating Game Content Patents is rooted in computer technology and as of the priority date provided an unconventional solution to the problem of providing updated game content to games on mobile devices. The claims of the Updating Game Content Patents enable updates to be provided based on "factors including a type of the mobile communication device, a telecom service associated with the mobile communication device, and a service provider of the telecom service." *See, e.g.*, '202 Patent, 15:9–13. As of the priority date of the Updating Game Contents Patents, mobile games were in their relative infancy, and wireless carriers each managed their own individual app store or "deck," with a limited catalog of games (typically two hundred to five hundred titles at once). The technology of the Updating Game Content Patents enabled games to be updated in a way that at the time was an unconventional use of mobile technology to provide updated game content for the mobile game.

33.    The claims of the '202 Patent expressly require, *inter alia*, the step of "checking what updated video-game content to send based on one of the factors including a type of the mobile communication device, a telecom service associated with the mobile communication device, and a service provider of the telecom service." *See, e.g.*, '202 Patent, 15:9–13. This claimed step improves the operation of a computer. This step allows transmission of the appropriate updated video-game content based on factors associated with a user's mobile device. This allows the updated video-game content to be tailored in a way that it is best suited for the video-game specific

to the mobile device. Thus, the claims of the '202 Patent are directed to a specific improvement to the way computers operate and are not abstract.

34.     Further, the '202 Patent explicitly recites a benefit of the claimed inventions as retaining the interest and engagement of users of video games on mobile devices, by updating the content of those video games from a server via the claimed methods. *See, e.g.*, '202 Patent, 2:7–11, 4:30–45. The claimed inventions thus solve a problem specifically arising in the computing realm and are thus necessarily rooted in computer technology and not abstract.

35.     The claims of the '202 Patent are specific to a narrow area of application, a video game that already exists on a mobile communication device, to which, on request, updated video-game content is uploaded based on factors associated with the mobile communication device, such as the type of the mobile communication device, the telecom service associated with the mobile communication device, and the service provider of the telecom service. The claims of the '202 Patent therefore do not pre-empt others from using the general concept of video games on a mobile communication device.

36.     The claims of the '202 Patent recite more than generic computer functionality and recite steps that were not purely conventional as of the priority date. The claims of the '202 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "receiving a request for the updated video game content from the mobile communication device, the updated video game content being usable in the video game that already exists on the mobile communication device," "checking what updated video-game content to send based on … factors including a type of the mobile communication device, a telecom service associated with the mobile communication device, and a service provider of the telecom service," "uploading updated video

game content to the communications device, the video game content being usable when the video game operates on the communications device." *See, e.g.*, '202 Patent, claim 1. These elements were not well-known, routine, or conventional because the idea of sending updated video-game content to a mobile device, let alone further specifying updated content based on what kind of mobile device, telecom service, or service provider, was not known or used in the mobile gaming industry. Indeed, to provide users with an updated version of a mobile game at the time, game developers would have to release a whole new edition of a game, because as of the priority date conventional gaming systems did not include the ability to send updated game content to mobile games.

37.    The claims of the '202 Patent thus recite improvements over prior art and conventional mobile video game systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the '202 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest claimed priority date of the '202 Patent.

38.    The '202 Patent was originally filed as U.S. Application No. 11/768,892 (the "'892 Application"). The U.S. Patent Examiner examining the '892 Application was Hsinchun Liao. On August 18, 2014, Examiner Liao issued a final rejection of the '892 Application.

39.    On January 20, 2015, the Applicant appealed the final rejection of the '892 Application to the Patent Trial and Appeal Board ("PTAB"). The PTAB assigned the appeal of the '892 Application Appeal No. 2016-001779.

40.    On February 2, 2016, in Appeal No. 2016-001779 the PTAB reversed the Examiner's rejection of the claims of the '892 Application, in particular stating "we do not sustain

the rejection of claims 15-17 and 33-35 under 35 U.S.C. § 102(b), or the rejection of dependent claims 18, 19, and 32 under 35 U.S.C. § 103(a)." A copy of this decision is attached as **Exhibit F**.

41.    The Applicant did not further amend the claims of the '892 Application, and on April 27, 2017, the Patent Office mailed a notice of allowance indicating that the claims of the '892 Application had been allowed. Thus, the claims that the PTAB confirmed were patentable in Appeal No. 2016-001779 issued as the claims of the '202 Patent.

42.    The PTAB's decision in Appeal No. 2016-001779 confirms that the claims of the '202 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest priority date of the '202 Patent.

43.    The claims of the '958 Patent expressly require, *inter alia,* that "the interface receives a request for updated content from the mobile communication device over the network" and "the server is operative to receive the request through the interface and utilize the request to check what pre-selected in-game advertising to send; and send the pre-selected in-game advertising stored on the storage medium." *See, e.g.,* '958 Patent 15:11-17. This claim step improves the operation of a computer by transmitting updated video-game content when an appropriate signal is transmitted through a mobile device. This allows updated video game content to be transmitted to a mobile device at the appropriate times. Thus, the claims of the '958 Patent are directed to a specific improvement to the way computers operate and are not abstract.

44.    Further, the '958 Patent explicitly recites a benefit of the claimed inventions as retaining the interest and engagement of users of video games on mobile devices, by updating the content of those video games from a server via the claimed methods. *See, e.g.*, '958 Patent, 2:12–

15, 4:38–48. The claimed inventions thus solve a problem specifically arising in the computing realm and are necessarily rooted in computer technology and not abstract.

45.     The claims of the '958 Patent are specific to a narrow area of application, a video game that already exists on a mobile communication device to which, on request, specific pre-selected in-game content is sent at the appropriate time. The claims of the '958 Patent therefore do not pre-empt others from using the general concept of video games on a mobile device.

46.     The claims of the '958 Patent recite more than generic computer functionality and recite steps that were not purely conventional as of the priority date. The claims of the '958 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "an interface coupled to the server and a network, wherein the interface receives a request for updated content from the mobile communication device over the network;" "the server is operative to receive the request through the interface and utilize the request to: check what pre-selected in-game advertising to send; and send the pre-selected in-game advertising stored on the storage medium send the pre-selected in-game advertising stored on the storage medium to the mobile communication device as the updated content for the mobile video game;" ('958 Patent, Claim 1) "receiving, at an interface coupled to a server and a network, a request for updated content from the mobile communication device over the network;" "receiving the request at the server through the interface; and utilizing the request to: identify what pre-selected in-game advertising to send; and send the pre-selected in-game advertising stored on the storage medium to the mobile communication device as the updated content for the mobile video game." *Id*., Claim 8. These elements were not well-known, routine, or conventional because in-game advertising for mobile games at the time was permanent and could not be updated. Thus, the ability to send new in-game

advertising as the updated content for a mobile video game based on a request to a server was not known in the art.

47.    The claims of the '958 Patent thus recite improvements over prior art and conventional mobile video game systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the '958 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest priority date of the '958 Patent.

48.    The claims of the '056 Patent expressly require, *inter alia*, the step of sending "a message relating to the in-game video game content to the mobile communication device in response to receiving the request, wherein the message is preselected by the server based on a model type associated with the mobile communication device, a service subscription associated with the mobile communication device, or a service provider for the service subscription associated with the mobile communication device." *See, e.g.,* '056 Patent 15:15-23. This step allows transmission of the appropriate updated video-game content based on factors associated with a user's mobile device. This allows the updated video-game content to be tailored in a way that it is best suited for the specific mobile device. Thus, the claims of the '056 Patent are directed to a specific improvement to the way computers operate and are not abstract.

49.    Further, the '056 Patent explicitly recites a benefit of the claimed inventions as retaining the interest and engagement of users of video games on mobile devices, by updating the content of those video games from a server via the claimed methods. *See, e.g.*, '056 Patent, 2:15–18, 4:38–48. The claimed inventions thus solve a problem specifically arising in the computing realm and are necessarily rooted in computer technology and not abstract.

50.    The claims of the '056 Patent are specific to a narrow area of application, a video game that already exists on a mobile communication device, to which, on request, updated video-game content is uploaded based on factors associated with the mobile communication device, such as the model type associated with the mobile communication device, a service subscription associated with the mobile communication device, or a service provider for the service subscription associated with the mobile communication device. The claims of the '056 Patent therefore do not pre-empt others from using the general concept of video games on a mobile communication device.

51.    The claims of the '056 Patent recite more than generic computer functionality and recite steps that were not purely conventional as of the priority date. The claims of the '056 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "wherein the server is configured to: receive a request for updated content from the mobile communication device; identify, in response to receiving the request, what in-game video game content to send; send a message relating to the in-game video game content to the mobile communication device in response to receiving the request, wherein the message is pre-selected by the server based on a model type associated with the mobile communication device, a service subscription associated with the mobile communication device, or a service provider for the service subscription associated with the mobile communication device; and send the in-game video game content to the mobile communication device as the updated content for the mobile video game" ('056 Patent, Claim 1); "receiving, at a server, a request from the mobile communication device for updated content from the mobile communication device; identifying, by the server in response to receiving the request, what pre-selected in-game video game content to send; sending a message relating to

the in-game video game content from the server to the mobile communication device in response to receiving the request, wherein the message is pre-selected by the server based on a model type associated with the mobile communication device, a service subscription associated with the mobile communication device, or a service provider for the service subscription associated with the mobile communication device; and sending, from the server, the pre-selected in-game video game content to the mobile communication device as the updated content for the mobile video game." *Id*., Claim 9. These elements were not well-known, routine, or conventional as of the priority date because the content of a mobile game at the time was static. Sending updated content based on type of mobile device, service subscription or service provider was not available in the art.

52.    The claims of the '056 Patent thus recite improvements over prior art and conventional mobile video game systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the claims of the '056 Patent, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest priority date of the '056 Patent.

53.    The '089 Patent and '662 Patent are collectively referred to herein as "the Hot Spot Patents." The '089 Patent was originally filed as U.S. Patent Application No. 11/768,890 on June 26, 2007, and the '662 Patent claims priority to that application. The Hot Spot Patents share the same specification and describe systems and methods for providing hot spots associated with a mobile video game on a mobile communication device and address shortcomings in the prior art.

54.    The Hot Spot Patents explain that "[m]any mobile communication devices (including cellular phones, PDAs, and other handheld devices capable of communicating with a

server) are capable of operating video games," and, further, that "most current mobile communication devices come equipped with one or more games at the time of purchase, and most modern mobile communication devices also allow users to download and/or purchase new games." '089 Patent, 1:13–19. "As a result, gaming on mobile communication devices has become a popular mode of entertainment in a mobile environment." *Id.* at 1:25–27.

55.     The Hot Spot Patents explain, however, that "[a]s game elements become increasingly familiar to players, the game may hold less surprises and/or no longer present a challenge to the user, at which point the user may stop playing that particular game in favor of others." '089 Patent, 1:29–32. The Hot Spot Patents describe a solution to this problem by "providing hot spots of triggered content within the gaming environment of a mobile video game on a mobile communication device," which "may prolong user interest in a game for a mobile communication device …." *Id.* at 1:60–2:2. "A hot spot can be thought of as a location or item, sometimes hidden within the game, that triggers additional specialized content when activated by a user or some other in-game element." *Id.* at 1:63–66; *see also id.* at 2:21–44, 4:7–16.

56.     As the Hot Spot Patents explain: "The ability to provide hot spots and update in-game hot spot information may allow game companies to keep game elements fresh and prolong user enjoyment of the game. For example, new interactive items and/or hidden features may be placed within a particular scene in the game so that the user has something new to look at or trigger (sometimes unexpectedly).… Consequently, the game may sustain its popularity and be more profitable for the game creator than existing mobile communication device games." *Id.* at 4:21–31. Thus, the Hot Spot Patents detail the problems with the prior art and exactly how the patent claims differ. *Id.* at 1:35-36, 4:21-24 ("games for mobile devices may be relatively simple or repetitive" but "[t]he ability to provide hot spots and update in-game hot spot information may

17

allow game companies to keep game elements fresh and prolong user enjoyment of the game"). Further, given the state of the art at the time, which was games for mobile communications devices that did not have updates and quickly lost user attention, what is claimed by the Hot Spot Patents was not conventional or well-known as of the priority date.

57.    The claims of the Hot Spot Patents are directed to methods and systems that improve computer functionality and increase the utility of computer-implemented games on mobile devices by providing hot spots associated with a mobile video game to the mobile device, which was not previously possible in the art. *See, e.g.*, '089 Patent, 5:9–6:35, 6:36–7:24, 7:25–12:35, 12:36–14:7, Figs. 1, 2A–2B, 3A–3B, 4A–4B. Importantly, these games cannot be played outside of the context of the claimed computer components on which they run.

58.    The claims of the Hot Spot Patents are directed to improving computer functionality through systems or methods that drive engagement by game players and help to retain control over the attention of the game players through controlling access to "hidden" content in a mobile video game via a "hot spot." As the Hot Spot Patents explain: "The ability to provide hot spots and update in-game hot spot information may allow game companies to keep game elements fresh and prolong user enjoyment of the game. For example, new interactive items and/or hidden features may be placed within a particular scene in the game so that the user has something new to look at or trigger (sometimes unexpectedly).… Consequently, the game may sustain its popularity and be more profitable for the game creator than existing mobile communication device games." *Id.* at 4:21–31.

59.    The claims of the Hot Spot Patents are directed to methods and systems that maintain user engagement in games by controlling access to "hidden" content in a mobile video game via a "hot spot." *See, e.g.*, '089 Patent, 1:63–2:2; 2:21–44, 4:7–16. The claims are thus

directed to a specific, structured graphical user interface that implements the "hot spot," which, when paired with the prescribed functionality directly related to the graphical user interface's structure, is addressed to and resolves a specifically identified problem in the prior art.

60.    The Hot Spot Patents explicitly recite a benefit of the claimed inventions as retaining the interest and engagement of users of video games on mobile devices, by providing hot spots of triggered content within the gaming environment of the video game. *See, e.g.*, '089 Patent, 1:60–2:2, 2:21–44, 4:7–16, 4:21–31. The claims of the Hot Spot Patents thus solve a problem specifically arising in the computing realm and are thus necessarily rooted in computer technology and therefore are not abstract.

61.    The subject matter of the claims of the Hot Spot Patents is rooted in computer technology and provides an unconventional solution to the problem of providing hot spots to games in mobile devices. The claims of the Hot Spot Patents enable control of access to "hidden" content in a mobile video game via a "hot spot." *See, e.g.*, '089 Patent, 1:63–2:2; 2:21–44, 4:7–16. As of the priority date of the Hot Spot Patents, mobile games were in their relative infancy, and did not include the ability to include downloadable hot spots. The technology of the Hot Spot Patents enabled these mobile game makers to provide hot spots in a way that at the time was an unconventional use of mobile technology.

62.    The claims of the Hot Spot Patents are specific to a narrow area of application, the innovative provision of hot spots of triggered content with the gaming environment of video games on mobile devices and controlling access to hidden content in the game via the hot spots. The claims of the Hot Spot Patents therefore do not pre-empt others from using the general concept of video games on a mobile communication device.

63.     The claims of the '089 Patent recite more than generic computer functionality and recite steps that were not purely conventional as of the priority date. The claims of the '089 Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "storing hot spot information on a computer-readable medium"; "determining the hot spot information to provide to the mobile device based upon the communication, the hot spot information comprising: a location in-game associated with activating the hot spot, wherein the location in-game is represented by a non-promotional background object; and hidden promotional content for presenting to the user, within a gaming environment of the mobile video game, when the hot spot is activated"; "uploading the hot spot information to the mobile communication device" ('089 Patent, Claim 1); "a storage medium for storing hot spot information for use in the mobile video game"; and "wherein the server is operative to receive the request through the interface and utilize the request to determine the hot spot information for the mobile video game, and send the hot spot information to the mobile communication device, the hot spot information comprising: a location in-game associated with activating the hot spot, wherein the location in-game is represented by a non-promotional background object; and hidden promotional content for presenting to the user, within a gaming environment of the mobile video game, when the hot spot is activated." *Id.*, Claim 6. These elements were not well-known, routine, or conventional because mobile games had fixed content that could not be updated. Thus, the ability to send updated, location specific hot spot information for a mobile game based on a request to a server was not known in the art.

64.     The claims of the '662 Patent recite more than generic computer functionality and recite steps that were not purely conventional as of the priority date. The claims of the '662 Patent recite at least the following elements which, either alone or as an ordered combination, were

unconventional and unique, and were not well-known, routine, or conventional: "contacting a server for hot spot information to download, comprising providing the server with at least one of: a game for which hot spot information is desired, a scene for which hot spot information is desired, an element for which hot spot information is desired, the model type of the mobile communication device, the service plan to which the mobile device belongs, the service provider for the mobile communications device, the base location of the mobile communication device, the current location of the mobile communication device, a version identifier for hot spot information currently on the mobile communication device, user-identification information, preset location, amount of game-play time, game score, and level of play"; "downloading hot spot information from the server to the mobile communication device, the hot spot information comprising: 1) hidden content for presenting to the user when the hot spot is activated; and 2) coordinate information"; "designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information"; "displaying an object at the designated non-promotional location"; "displaying the hidden content when the user activates the hot spot" ('662 Patent, Claim 1); "contacting a server for hot spot information to download, comprising providing the server with user-identification information"; "downloading hot spot information from the server to the mobile communication device, the hot spot information comprising: 1) hidden promotional content for presenting to the user when the hot spot is activated; and 2) coordinate information"; "designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information"; "displaying an object at the designated non-promotional location"; and "displaying the hidden promotional content when the user activates the hot spot." *Id.*, Claim 13. These elements were not well-known, routine, or conventional as of the priority date because mobile games at the time could not be updated, and thus could not download

updated game information such as hot spot information. Thus, downloading hot spot information for a mobile game based on a request to a server, let alone selecting that hot spot information based on specific factors such as the scene for which hot spot information is desired, the base or current location of a mobile communication device, amount of game-play time, game score, a version identifier, user identification information, and level of play was not known in the art.

65. The claims of the Hot Spot Patents thus recite improvements over prior art and conventional mobile video game systems and methods and represent meaningful limitations and/or inventive concepts. The mechanisms by which the claims of the Hot Spot Patents solve the problems in the prior art are recited with specificity and explain how results are obtained in a non-abstract way. Further, in view of these specific improvements, the claims of the Hot Spot Patents, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest priority date of the Hot Spot Patents.

66. Further, the Examiner addressing the '662 Patent during prosecution recognized that the claims of the '662 Patent are patent eligible under Section 101. In particular, the Examiner issued a post-*Alice* rejection under Section 101 on July 17, 2015, but subsequently withdrew the rejection on November 17, 2015, in view of Applicant's arguments concerning the rejection under Section 101, which the Examiner considered and found "persuasive." *See* **Exhibit G**.

## GENERAL ALLEGATIONS

67. Playrix has and continues to make, use, import, sell, or offer for sale mobile games that infringe claims of the Patents-in-Suit, including at least the mobile games Homescapes, Fishdom, Farmscapes, Gardenscapes, ManorMatters, Township, and Wildscapes (collectively, "the Accused Games").

68.     Each of the Accused Games operates on mobile communication devices, including those with iOS and Android operating systems. *See, e.g.*, https://playrix.com/games/gardenscapes.



69.     Playrix operates, places into service, or otherwise controls a plurality of servers worldwide, including in the United States, on which Playrix operates, and its customers and other users use, software related to each of the Accused Games and on which Playrix stores data associated with each of the Accused Games. *See, e.g.*, https://playrix.helpshift.com/hc/en/3-township/faq/19-progress-transfer/

70.     Each of the Accused Games has millions of registered users worldwide, including users in the United States, Texas, and this District.

71.     Playrix has had knowledge of each of the Patents-in-Suit and notice of its infringement thereof since at least the filing of this lawsuit.

72.     Moreover, Playrix also had knowledge of each of the Patents-in-Suit, and/or the applications leading to them, since at least January 2021. Specifically, the following image was a part of the Information Memorandum sent to Playrix by MDX's representatives on or around January 19, 2021, which specifically identifies the full patent numbers of the '202, '958, '089, and '662 Patents, and also identified pending application no. 16/844,256, which would issue as the '056 Patent on September 14, 2021.



73. On or around January 19, 2021, MDX and/or its representatives had various meetings with representatives of Playrix regarding a potential transaction to acquire MDX and its patent portfolio. During these meetings, MDX identified the patent portfolio to Playrix.

74. Playrix has thus had knowledge of at least the '202, '958, '089, and '662 Patents since January 2021.

75. On information and belief Playrix had knowledge of the '056 Patent on or around its issue date, September 13, 2021.

**COUNT I**
**(Infringement of United States Patent No. 9,731,202)**

76. FPG realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this complaint.

77. Playrix directly infringes, literally or under the doctrine of equivalents, one or more claims of the '202 Patent by, without authority, making, using, importing, selling, or offering to sell the Accused Games within the United States, in violation of 35 U.S.C. § 271.

78. For example, claim 1 of the '202 Patent recites:

[preamble] A method for providing updated video-game content to a mobile communication device for use in a mobile video game, the method comprising the steps of:
[a] receiving a request for the updated video-game content from the mobile communication device, the updated video-game content being usable in the video game that already exists on the mobile communication device;
[b] checking what updated video-game content to send based on one of the factors including a type of the mobile communication device, a telecom service associated with the mobile communication device, and a service provider of the telecom service; and
[c] uploading updated video-game content to the communications device, the video-game content being usable when the video game operates on the communications device.

79. The features of claim 1 of the '202 Patent are practiced by each of the Accused Games, including at least exemplary Accused Game Gardenscapes.

80. To the extent the preamble is found to be limiting, Gardenscapes is a game played by players on mobile devices using various mobile platforms and operating systems in contact with remote servers that provide updated video-game content to the mobile communication device executing Gardenscapes. Gardenscapes is updated frequently, and some of these updates include new and updated in-game content, including new events. *See, e.g.*, https://apps.apple.com/us/app/gardenscapes/id1105855019;

https://play.google.com/store/apps/details?id=com.playrix.gardenscapes&hl=en_US&gl=US

**What's New**

Version History

Version 6.2.0

NEW EVENTS
- Dance Season starts in late May. Get the Golden Ticket to help Austin prepare for the City Ball!!
- Join the Makeover team to help a young woman change her lifestyle in the middle of June.
- Help Robbie express his love for his wife by hosting an incredible kite festival in late June.

ALSO
- Take part in an exciting Archaeology Race to win amazing prizes.
- Adventures in the garden continue! Find out if Chloe has what it takes to become a stage manager and put on an amazing play together!
- Unlock a new area to turn an unruly grove into a reality show set!

81.  Gardenscapes satisfies element [a] because the remote server receives requests for updated video-game content from the mobile communication device, after installation of Gardenscapes on the mobile communication device. These updates are loaded to the user's mobile device when the user launches Gardenscapes after the update has been loaded to the server. *See, e.g.*,  https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/ ("We usually release our exciting new updates around every 2 months 😊 ").

82.  Gardenscapes satisfies element [b] because Gardenscapes is playable on several different types of mobile platforms, and the server transmits an update configured to operate on the specific platform on which the user is executing the Gardenscapes mobile application. A different update is requested based on the type of device, and/or based on the platform for that device (e.g., Android or iOS). This is confirmed by the fact that Playrix releases updates for devices that use different operating systems at different times, demonstrating that each platform has a different update, and that different platforms will request and receive a different update. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/  ("Please bear in mind that a new version of the game is released on different platforms with small delays in time (sometimes up to several days)  ⏰  That happens due to a difference in the procedures for checking the update on different platforms. Don't worry, the update will be available very soon for you too!  🤗  You may need to reinstall the game to get the latest available version of the game

😊 ”);        https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/8012-system-requirements-1645115343/ ("Apple mobile devices running iOS 10.0 or above; - Android and Amazon Kindle devices running Android 4.4 or above; - Apple macOS devices running OS X 10.10 or above; - Windows devices Running Windows 10 or above."); https://playrix.com/games/gardenscapes

## Gardenscapes

Restore an enchanting garden to its former glory with Austin the Butler and his friends in the hit game that started it all!

      

83.    Gardenscapes satisfies element [c] because the server uploads the updated videogame content to the mobile communication device and that updated content is then playable in the user's Gardenscapes mobile application. *See, e.g*., https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/ ("Our games are constantly growing and evolving. With each update, we make sure Gardenscapes is even more fun to play. We add awesome new events and features to give you the best gaming experience 😊 Update regularly to fully enjoy the game."); https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6339-what-are-in-game-events/ ("It's event time! Apart from levels and tasks, our temporary events make your garden experience even more exciting! Themed events are usually holiday based (Christmas, Lunar New Year, Easter, Halloween, etc.), and are part of every major update! You can also find regular time-limited events in the game 🌈 Simply check the News tab or update descriptions to find out more about upcoming events 🖼 ").

84.    Playrix has known of the '202 Patent and its claims since at least January 2021.

85.    Playrix indirectly infringes one or more claims of the '202 Patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Playrix has knowingly and intentionally induced Gardenscapes users to directly infringe at least claim 1 of the '202 Patent,

*inter alia*, by providing instructions or information, for example on publicly available websites to explain how to use Gardenscapes in an infringing manner. *See, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/. These examples include descriptions of using Gardenscapes in the manner described above, and Playrix touts these infringing uses of Gardenscapes in advertisements, including but not limited to those on websites and other mobile app marketplace websites and social media.

86.     Playrix indirectly infringes one or more claims of the '202 Patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing Gardenscapes, which, as evidenced by Playrix's website (*see, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/), is especially made for use in a manner infringing one or more claims of the '202 Patent as described herein and has no substantial non-infringing uses.

87.     FPG has been and continues to be injured by Playrix's infringement of the '202 Patent. FPG is entitled to recover damages adequate to compensate it for Playrix's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

88.     Unless enjoined by this Court, Playrix's acts of infringement will continue to damage and cause irreparable harm to FPG.

89.     Playrix's infringement of the '202 Patent has been willful and deliberate. Since at least January 2021, Playrix has known of the '202 Patent and that its games practice the claims of the '202 Patent and has continued its infringement and unlawful actions nevertheless. FPG is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

### COUNT II
### (Infringement of United States Patent No. 10,617,958)

90.     FPG realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this complaint.

91.     Playrix directly infringes, literally or under the doctrine of equivalents, one or more claims of the '958 Patent by, without authority, making, using, importing, selling, or offering to sell the Accused Games within the United States, in violation of 35 U.S.C. § 271.

92.     For example, claim 1 of the '958 Patent recites:

[preamble] A system for providing updated content associated with a mobile video game to a mobile communication device, the system comprising:
[a] a storage medium for storing pre-selected in-game advertising for use in a video game;
[b] a server in communication with the storage medium; and
[c] an interface coupled to the server and a network, wherein the interface receives a request for updated content from the mobile communication device over the network;
[d] wherein the server is operative to receive the request through the interface and utilize the request to: check what pre-selected in-game advertising to send; and
[e] send the pre-selected in-game advertising stored on the storage medium to the mobile communication device as the updated content for the mobile video game.

93.     The features of claim 1 of the '958 Patent are practiced by each of the Accused Games, including at least exemplary Accused Game Gardenscapes.

94.    To the extent the preamble is found to be limiting, Gardenscapes is a game played by players on mobile devices using various mobile platforms and operating systems in contact with remote servers that provide updated video-game content to the mobile communication device executing Gardenscapes. Gardenscapes is updated frequently, and some of these updates include new and updated in-game content, including new events. *See, e.g.*, https://apps.apple.com/us/app/gardenscapes/id1105855019;

https://play.google.com/store/apps/details?id=com.playrix.gardenscapes&hl=en_US&gl=US

**What's New**                                            Version History

NEW EVENTS                                                Version 6.2.0
- Dance Season starts in late May. Get the Golden Ticket to help Austin prepare for
the City Ball!
- Join the Makeover team to help a young woman change her lifestyle in the middle
of June.
- Help Robbie express his love for his wife by hosting an incredible kite festival in
late June.

ALSO
- Take part in an exciting Archaeology Race to win amazing prizes.
- Adventures in the garden continue! Find out if Chloe has what it takes to become a
stage manager and put on an amazing play together!
- Unlock a new area to turn an unruly grove into a reality show set!

95.    Gardenscapes satisfies element [a] because the server includes access to a storage medium that stores preselected in game advertising that is periodically transmitted to mobile devices executing Gardenscapes. This preselected in game advertising includes "special offers." *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/4686-how-do-i-make-in-game-purchases-1585584340/ ("Occasionally, you may see special offers on the right side of the screen. Hit the special offer icon to see the whole offer 😎 If you like it, you can confirm your purchase by pressing the price button. Special offers are time-limited, so don't miss your chance!"); https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3987-gold-reserve-special-offer/ ("Special offer gives you the chance to buy coins. In addition to standard rewards, you'll get bonus coins for each level you beat while the special offer is on. The coins will be kept in a special safe, and you'll have the chance to buy them at a great price as soon as you collect the number listed in the offer

terms. Bonus coins don't affect the regular reward for beating levels: you earn as many stars as usual with the safe and without it."); https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/5655-why-don-t-i-have-a-special-offer-but-my-friend-does/ ("If you don't have a special offer but someone else does, don't worry! Promotions are distributed on a random and automatic basis, and they depend on many things such as your current game progress, location and so on. Please note that most of the offers are time-limited. Don't forget that the timer activates when you get the promotion, and it doesn't stop if you close the game. You can take advantage of the special offers only until they expire. Unfortunately, we won't be able to activate the promotion once it's over.").

96.     Gardenscapes satisfies element [b] because Gardenscapes includes a server in communication with the storage medium to provide updates to users of the Gardenscapes games. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/716-lost-my-game-progress/ ("Have you lost your game progress? We're here to help! 😄 Here's what you should do: 1. Restart your device and reinstall the game 🎮 2. Connect the game to your previously used Facebook, Google, or Apple ID account. 3. Tap/click "Select" on the "On Server" pop-up window. 4. Type OK and press Confirm.").

97.     Gardenscapes satisfies element [c] through the network connection between the server and the data network coupled to the user's mobile device, which is required to play Gardenscapes. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/8012-system-requirements-1645115343/ ("1 GB of RAM and 1 GB of free space Recommended requirements: 2 GB of RAM and 1.5 GB of free space. A stable internet connection.").

98.     Gardenscapes satisfies element [d] because the server receives the request and uses the request to determine what pre-selected in-game advertising to send. In particular, promotions "depend on many things such as your current game progress, location and so on" and thus are

preselected for users at a certain "game progress, location and so on." https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/5655-why-don-t-i-have-a-special-offer-but-my-friend-does/.

99.     Gardenscapes satisfies element [e] because the server subsequently sends the pre-selected in-game advertising to the mobile communication device. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/4686-how-do-i-make-in-game-purchases-1585584340/ ("Occasionally, you may see special offers on the right side of the screen. Hit the special offer icon to see the whole offer 🤩 If you like it, you can confirm your purchase by pressing the price button. Special offers are time-limited, so don't miss your chance!"); https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3987-gold-reserve-special-offer/ ("Special offer gives you the chance to buy coins. In addition to standard rewards, you'll get bonus coins for each level you beat while the special offer is on. The coins will be kept in a special safe, and you'll have the chance to buy them at a great price as soon as you collect the number listed in the offer terms. Bonus coins don't affect the regular reward for beating levels: you earn as many stars as usual with the safe and without it."); https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/5655-why-don-t-i-have-a-special-offer-but-my-friend-does/ ("If you don't have a special offer but someone else does, don't worry! Promotions are distributed on a random and automatic basis, and they depend on many things such as your current game progress, location and so on. Please note that most of the offers are time-limited. Don't forget that the timer activates when you get the promotion, and it doesn't stop if you close the game. You can take advantage of the special offers only until they expire. Unfortunately, we won't be able to activate the promotion once it's over.").

100.    Playrix has known of the '958 Patent and its claims since at least January 2021.

101.    Playrix indirectly infringes one or more claims of the '958 Patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Playrix has knowingly and intentionally induced Gardenscapes users to directly infringe at least claim 1 of the '958 Patent, *inter alia*, by providing instructions or information, for example on publicly available websites to explain how to use Gardenscapes in an infringing manner. *See, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/.

These examples include description of using Gardenscapes the manner described above, and Playrix touts these infringing uses of Gardenscapes in advertisements, including but not limited to those on websites and other mobile app marketplace websites and social media.

102.    Playrix indirectly infringes one or more claims of the '958 Patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing Gardenscapes, which, as evidenced by Playrix's website (*see, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/), is especially made for use in a manner infringing one or more claims of the '958 Patent as described herein and has no substantial non-infringing uses.

103.    FPG has been and continues to be injured by Playrix's infringement of the '958 Patent. FPG is entitled to recover damages adequate to compensate it for Playrix's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

104.    Unless enjoined by this Court, Playrix's acts of infringement will continue to damage and cause irreparable harm to FPG.

105.    Playrix's infringement of the '958 Patent has been willful and deliberate. Since at least January 2021, Playrix has known of the '958 Patent and that its games practice the claims of the '958 Patent and has continued its infringement and unlawful actions nevertheless. FPG is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

**COUNT III**
**(Infringement of United States Patent No. 11,117,056)**

106.    FPG realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this complaint.

107.    Playrix directly infringes, literally or under the doctrine of equivalents, one or more claims of the '056 Patent by, without authority, making, using, importing, selling, or offering to sell the Accused Games within the United States, in violation of 35 U.S.C. § 271.

108.    For example, claim 1 of the '056 Patent recites:

[preamble] A system for providing updated content associated with a mobile video game to a mobile communication device, the system comprising:
    [a] a storage medium for storing in-game video game content;
    [b] a server in communication with the storage medium; and
    [c] wherein the server is configured to: receive a request for updated content from the mobile communication device;
        [d] identify, in response to receiving the request, what in-game video game content to send;
        [e] send a message relating to the in-game video game content to the mobile communication device in response to receiving the request, wherein the message is pre-selected by the server based on a model type associated

> with the mobile communication device, a service subscription associated
> with the mobile communication device, or a service provider for the service
> subscription associated with the mobile communication device; and
>
> [f] send the in-game video game content to the mobile
> communication device as the updated content for the mobile video game.

109.    The features of claim 1 of the '056 Patent are practiced by each of the Accused Games, including at least exemplary Accused Game Gardenscapes.

110.    To the extent the preamble is found to be limiting, Gardenscapes is a game played by players on mobile devices using various mobile platforms and operating systems in contact with remote servers that provide updated video-game content to the mobile communication device executing the Gardenscapes game. Gardenscapes is updated frequently, and these updates include new and updated in-game content, including new events. *See, e.g.*, https://apps.apple.com/us/app/gardenscapes/id1105855019;

https://play.google.com/store/apps/details?id=com.playrix.gardenscapes&hl=en_US&gl=US

**What's New**                                          Version History

NEW EVENTS                                              Version 6.2.0
- Dance Season starts in late May. Get the Golden Ticket to help Austin prepare for
the City Ball!
- Join the Makeover team to help a young woman change her lifestyle in the middle
of June.
- Help Robbie express his love for his wife by hosting an incredible kite festival in
late June.

ALSO
- Take part in an exciting Archaeology Race to win amazing prizes.
- Adventures in the garden continue! Find out if Chloe has what it takes to become a
stage manager and put on an amazing play together!
- Unlock a new area to turn an unruly grove into a reality show set!

111.    Gardenscapes satisfies element [a] because the server includes access to a storage medium for storing in-game video game content that is transmitted Gardenscapes players. These updates are loaded to the user's mobile device when the user launches Gardenscapes after the update has been loaded to the server. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/ ("We usually release our exciting new updates around every 2 months 🤗").

112.    Gardenscapes satisfies element [b] because Gardenscapes includes a server in communication with the storage medium to provide updates to users of the Gardenscapes games. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/716-lost-my-game-progress/ ("Have you lost your game progress? We're here to help! 🤗 Here's what you should do: 1. Restart your device and reinstall the game 🎮 2. Connect the game to your previously used Facebook, Google, or Apple ID account. 3. Tap/click "Select" on the "On Server" pop-up window. 4. Type OK and press Confirm.").

113.    Gardenscapes satisfies elements [c] and [d] because the server receives the request and uses the request to determine what content to send. In particular, some content may be specific to the user, including promotions, which "depend on many things such as your current game progress, location and so on." https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/5655-why-don-t-i-have-a-special-offer-but-my-friend-does/. Further, Gardenscapes is executed on multiple different game platforms, and the server provides updates that are specific to those platforms, as identified by the request. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/ ("Please bear in mind that a new version of the game is released on different platforms with small delays in time (sometimes up to several days) ⏰ That happens due to a difference in the procedures for checking the update on different platforms. Don't worry, the update will be available very soon for you too! 🤗 You may need to reinstall the game to get the latest available version of the game 😊"); https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/8012-system-requirements-1645115343/ ("Apple mobile devices running iOS 10.0 or above; - Android and Amazon Kindle devices running Android 4.4 or above; - Apple macOS devices running OS X 10.10 or above; - Windows devices Running Windows 10 or above."); https://playrix.com/games/gardenscapes.

114.    Gardenscapes satisfies element [e] because the server sends the updated in-game video game content to the mobile communication device in response to receiving the request, wherein the message is pre-selected by the server based on a model type associated with the mobile communication device. Gardenscapes is executed on multiple different game platforms, and the server provides updates that are specific to those platforms. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/ ("Please bear in mind that a new version of the game is released on different platforms with small delays in time (sometimes up to several days) ⏰ That happens due to a difference in the procedures for checking the update on different platforms. Don't worry, the update will be available very soon for you too! 🤗 You may need to reinstall the game to get the latest available version of the game 😊").

115.    Gardenscapes satisfies element [f] because the server sends the in-game video game content to the mobile communication device as the updated content for the mobile video game. Updates are loaded to the user's mobile device when the user launches Gardenscapes after the update has been loaded to the server. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/ ("We usually release our exciting new updates around every 2 months 🤗").

116.    Playrix has known of the '056 Patent and its claims since at least the filing of this Complaint, and, on information and belief, Playrix has known of the '056 Patent and its claims since on or around the issue date of the '056 Patent.

117.    Playrix indirectly infringes one or more claims of the '056 Patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Playrix has knowingly and intentionally induced Gardenscapes users to directly infringe at least claim 1 of the '056 Patent,

*inter alia*, by providing instructions or information, for example on publicly available websites to explain how to use Gardenscapes in an infringing manner. *See, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/.

These examples include description of using Gardenscapes in the manner described above, and Playrix touts these infringing uses of Gardenscapes in advertisements, including but not limited to those on websites and other mobile app marketplace websites and social media.

118.    Playrix indirectly infringes one or more claims of the '056 Patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing Gardenscapes, which, as evidenced by Playrix's website (*see, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/),    is especially made for use in a manner infringing one or more claims of the '056 Patent as described herein and has no substantial non-infringing uses.

119.    FPG has been and continues to be injured by Playrix's infringement of the '056 Patent. FPG is entitled to recover damages adequate to compensate it for Playrix's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

120.    Unless enjoined by this Court, Playrix's acts of infringement will continue to damage and cause irreparable harm to FPG.

121.    Playrix's infringement of the '056 Patent has been willful and deliberate. Playrix has known of the '056 Patent and its claims since at least the filing of this Complaint, and, on information and belief, Playrix has known of the '056 Patent and its claims since on or around the issue date of the '056 Patent. Playrix has continued its infringement and unlawful actions nevertheless. FPG is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT IV
### (Infringement of United States Patent No. 8,688,089)

122.    FPG realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this complaint.

123.    Playrix directly infringes, literally or under the doctrine of equivalents, one or more claims of the '089 Patent by, without authority, making, using, importing, selling, or offering to sell the Accused Games within the United States, in violation of 35 U.S.C. § 271.

124.    For example, claim 1 of the '089 Patent recites:

[preamble] A method for providing a hot spot associated with a mobile video game, the mobile video game being operable on a mobile communication device, the method comprising the steps of:
    [a] storing hot spot information on a computer-readable medium;
    [b] receiving a communication from a mobile communication device;
    [c] determining the hot spot information to provide to the mobile device based upon the communication, the hot spot information comprising:
        [d] a location in-game associated with activating the hot spot, wherein the location in-game is represented by a non-promotional background object; and
        [e] hidden promotional content for presenting to the user, within a gaming environment of the mobile video game, when the hot spot is activated; and
        [f] uploading the hot spot information to the mobile communication device.

125.    The features of claim 1 of the '089 Patent are practiced by each of the Accused Games, including at least exemplary Accused Game Gardenscapes.

126.    To the extent the preamble is found to be limiting, Gardenscapes is a game played by players on mobile devices using various mobile platforms and operating systems in contact with remote servers that provide updates to the mobile communication devices, including hotspots. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/ ("We usually release our exciting new updates around every 2 months 😊").

127.    Gardenscapes satisfies element [a] because the server includes access to a computer-readable medium for storing in-game updates, including hot-spots, that are transmitted to Gardenscapes players. These updates are loaded to the user's mobile device when the user launches Gardenscapes after the update has been loaded to the server. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/    ("We usually release our exciting new updates around every 2 months 😊").

128.    Gardenscapes satisfies element [b] because the server receives the request and uses the request to determine what content to send. In particular, some content may be specific to the user, including promotions, which "depend on many things such as your current game progress, location and so on." https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/5655-why-don-t-i-have-a-special-offer-but-my-friend-does/. Further, Gardenscapes is executed on multiple different game platforms, and the server provides updates that are specific to those platforms, as identified by the request. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/ ("Please bear in mind that a new version of the game is released on different platforms with small delays in time (sometimes up to several days) ⏰ That happens due to a difference in the procedures for checking the update on different platforms. Don't worry, the update

will be available very soon for you too! 😊 You may need to reinstall the game to get the latest available version of the game 😊 "); https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/8012-system-requirements-1645115343/ ("Apple mobile devices running iOS 10.0 or above; - Android and Amazon Kindle devices running Android 4.4 or above; - Apple macOS devices running OS X 10.10 or above; - Windows devices Running Windows 10 or above."); https://playrix.com/games/gardenscapes.

129.    Gardenscapes satisfies element [c] because the server identifies in response to the request what in-game video game content, including a hot spot, to send to the user's mobile device. Gardenscapes is executed on multiple different game platforms, and the server provides updates that are specific to those platforms. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/ ("Please bear in mind that a new version of the game is released on different platforms with small delays in time (sometimes up to several days) 🔴 That happens due to a difference in the procedures for checking the update on different platforms. Don't worry, the update will be available very soon for you too! 😊 You may need to reinstall the game to get the latest available version of the game 😊 ").

130.    Gardenscapes satisfies element [d] because the hot spot information includes a location in-game associated with activating the hot spot as shown below:



131.    Gardenscapes satisfies element [e] because the hot spot information includes a hidden promotional content for presenting to the user, within a gaming environment of the mobile video game, when the hot spot is activated, as shown below:



132.    Gardenscapes satisfies element [f] because the server uploads the in-game content, including the hot spot information to the mobile communication device, e.g., when providing updates to the Gardenscapes game. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/ ("We usually release our exciting new updates around every 2 months 😊").

133.    Playrix has been aware of the '089 Patent and its claims since at least January 2021.

42

134.    Playrix indirectly infringes one or more claims of the '089 Patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Playrix has knowingly and intentionally induced Gardenscapes users to directly infringe at least claim 1 of the '089 Patent, *inter alia*, by providing instructions or information, for example on publicly available websites to explain how to use Gardenscapes in an infringing manner. *See, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/;

https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/.

These examples include description of using Gardenscapes in the manner described above, and Playrix touts these infringing uses of Gardenscapes in advertisements, including but not limited to those on websites and other mobile app marketplace websites and social media.

135.    Playrix indirectly infringes one or more claims of the '089 Patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing Gardenscapes, which, as evidenced by Playrix's website (*see, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/), is especially made for use in a manner infringing one or more claims of the '089 Patent as described herein and has no substantial non-infringing uses.

136.    FPG has been and continues to be injured by Playrix's infringement of the '089 Patent. FPG is entitled to recover damages adequate to compensate it for Playrix's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

137.    Unless enjoined by this Court, Playrix's acts of infringement will continue to damage and cause irreparable harm to FPG.

138.    Playrix's infringement of the '089 Patent has been willful and deliberate. Since at least January 2021, Playrix has known of the '089 Patent and that its games practice the claims of the '089 Patent and has continued its infringement and unlawful actions nevertheless. FPG is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

**COUNT V**
**(Infringement of United States Patent No. 9,427,662)**

139.    FPG realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this complaint.

140.    Playrix directly infringes, literally or under the doctrine of equivalents, one or more claims of the '662 Patent by, without authority, making, using, importing, selling, or offering to sell the Accused Games within the United States, in violation of 35 U.S.C. § 271.

141.    For example, claim 1 of the '662 Patent recites:

[preamble] A method for retrieving and displaying a hot spot associated with a video game operable on a mobile communication device, comprising:
        a) contacting a server for hot spot information to download, comprising providing the server with at least one of: a game for which hot spot information is desired, a scene for which hot spot information is desired, an element for which hot spot information is desired, the model type of the mobile communication device, the service plan to which the mobile device belongs, the service provider for the mobile communications device, the base location of the mobile communication device, the current location of the mobile communication device, a version identifier for hot spot information currently on the mobile communication device,

user-identification information, preset location, amount of game-play time, game score, and level of play;

b) downloading hot spot information from the server to the mobile communication device, the hot spot information comprising:

1) hidden content for presenting to the user when the hot spot is activated; and

2) coordinate information;

c) designating a non-promotional location in-game associated with activating the hot spot based on the coordinate information;

d) displaying an object at the designated non-promotional location; and

e) displaying the hidden content when the user activates the hot spot.

142.    The features of claim 1 of the '662 Patent are practiced by each of the Accused Games, including at least exemplary Accused Game Gardenscapes.

143.    To the extent the preamble is found to be limiting, Gardenscapes is a game played by players on mobile devices using various mobile platforms and operating systems in contact with remote servers that provide updated video-game content to the mobile communication device executing the Gardenscapes game. Gardenscapes is updated frequently, and these updates include new and updated in-game content, including new events. *See, e.g.*, https://apps.apple.com/us/app/gardenscapes/id1105855019;

https://play.google.com/store/apps/details?id=com.playrix.gardenscapes&hl=en_US&gl=US



144.    Gardenscapes satisfies element [a] because the Gardenscapes client application contacts the server for updates, including hot spot information to download. For example, updates including promotions are selected based on "many things such as your current game progress,

location and so on" and thus are preselected for users at a certain "game progress, location and so on." https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/5655-why-don-t-i-have-a-special-offer-but-my-friend-does/. This indicates that the game requests updates and includes information regarding the player's status in the request. Further, Gardenscapes is playable on several different types of mobile platforms, and the server transmits an update configured to operate on the specific platform on which the user is executing the Gardenscapes mobile application, indicating that the request identified the type of device (e.g., Android or iOS) making the request. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/ ("Please bear in mind that a new version of the game is released on different platforms with small delays in time (sometimes up to several days) ⏰ That happens due to a difference in the procedures for checking the update on different platforms. Don't worry, the update will be available very soon for you too! 🤗 You may need to reinstall the game to get the latest available version of the game 😊 ").

145.    Gardenscapes satisfies element [b] because the server sends the in-game content, including the hot spot information to be downloaded by the mobile communication device, e.g., when providing updates to the Gardenscapes game. *See, e.g.*, https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/ ("We usually release our exciting new updates around every 2 months 🤗 ").

146.    Gardenscapes satisfies element [b][1] because the hot spot information comprises hidden content for presenting to the user when the hot spot is activated, as shown below:





147.   Gardenscapes satisfies element [b][2] because the hot spot information comprises coordinate information indicating the location on the screen at which the hot spot will be positioned.

148.   Gardenscapes satisfies element [c] because the hot spot is displayed in a non-promotional location in-game associated with activating the hot spot based on the coordinate information, as shown below:



149.    Gardenscapes satisfies element [d] because the hot spot is displayed as an object at the designated non-promotional location, as shown below:



150.    Gardenscapes satisfies element [e] because hidden content is displayed when the user activates the hot spot, as shown below:



151.    Playrix has been aware of the '662 Patent and its claims since at least January 2021.

152.    Playrix indirectly infringes one or more claims of the '662 Patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Playrix has knowingly and intentionally induced Gardenscapes users to directly infringe at least claim 1 of the '662 Patent, *inter alia*, by providing instructions or information, for example on publicly available websites to explain how to use Gardenscapes in an infringing manner. *See, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/. These examples include description of using Gardenscapes in the manner described above, and Playrix touts these infringing uses of Gardenscapes in advertisements, including but not limited to those on websites and other mobile app marketplace websites and social media.

153.    Playrix indirectly infringes one or more claims of the '662 Patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing Gardenscapes, which, as evidenced by Playrix's website (*see, e.g.*, https://playrix.com/games/gardenscapes; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/3975-why-do-i-need-to-update-the-game/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/6454-i-don-t-have-an-update/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/686-when-are-updates-released/; https://playrix.helpshift.com/hc/en/5-gardenscapes/faq/11375-how-do-i-play-gardenscapes/), is especially made for use in a manner infringing one or more claims of the '662 Patent as described herein and has no substantial non-infringing uses.

154.    FPG has been and continues to be injured by Playrix's infringement of the '662 Patent. FPG is entitled to recover damages adequate to compensate it for Playrix's infringing activities in an amount to be determined at trial, but in no event less than a reasonable royalty.

155.    Unless enjoined by this Court, Playrix's acts of infringement will continue to damage and cause irreparable harm to FPG.

156.    Playrix's infringement of the '662 Patent has been willful and deliberate. Since at least January 2021, Playrix has known of the '662 Patent and that its games practice the claims of the '662 Patent and has continued its infringement and unlawful actions nevertheless. FPG is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, FPG respectfully prays that this Court:

a.  Enter a judgment that Playrix has infringed the Patents-in-Suit;

b.  Grant a permanent injunction restraining and enjoining Playrix and its officers, directors, agents, servants, employees, successors, assigns, parents, subsidiaries, affiliated or related companies, and attorneys from directly or indirectly infringing the Patents-in-Suit;

c.  Award FPG damages in an amount sufficient to compensate FPG for Playrix's infringement of the Patents-in-Suit, but not less than a reasonable royalty, together with pre- and post-judgment interest and costs;

d.  Enter a declaration that the case is exceptional and correspondingly award FPG attorney fees and costs under 35 U.S.C. § 285;

e.  Find that Playrix's infringement of the Patents-in-Suit has been willful and award enhanced damages, interest, and costs to FPG under 35 U.S.C. § 284; and

f.   Grant such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

FPG hereby demands a jury trial on all issues appropriately triable by a jury.

DATED:  March 31, 2023          */s/ Melissa R. Smith*
                                Melissa R. Smith
                                (Texas State Bar No. 24001351)
                                GILLAM & SMITH LLP
                                303 South Washington Avenue
                                Marshall, Texas  75670
                                Telephone:  (903) 934-8450
                                Facsimile:   (903) 934-9257
                                Email:  melissa@gillamsmithlaw.com

Of Counsel:                     KILPATRICK TOWNSEND & STOCKTON LLP
                                Steven D. Moore (CA Bar No. 290875)
                                Rishi Gupta (CA Bar No. 313079)
                                Two Embarcadero Center, Suite 1900
                                San Francisco, CA  94111
                                Telephone:  (415) 576-0200
                                Facsimile:   (415) 576-0300
                                Email:  smoore@kilpatricktownsend.com
                                Email:  rgupta@kilpatricktownsend.com

                                Michael T. Morlock (GA Bar No. 647460)
                                Joshua H. Lee (GA Bar No. 489842)
                                1100 Peachtree Street, NE
                                Suite 2800
                                Atlanta, Georgia 30309
                                Telephone:  (404) 815-6500
                                Facsimile:   (404) 815-6555
                                Email:  mmorlock@kilpatricktownsend.com
                                Email:  jlee@kilpatricktownsend.com

                                Kasey E. Koballa (NC Bar No. 53766)
                                4208 Six Forks Road
                                Raleigh, NC  27609
                                Telephone:     (919) 420-1700
                                Facsimile:     (919) 420-1800
                                Email:  kkoballa@kilpatricktownsend.com

                                *Attorneys for Plaintiff Flip Phone Games Inc.*